# EXHIBIT "2"

# EXHIBIT "2"

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


| | |
|---|---|
| Eastern Industries, LLC, a<br>New York limited liability<br>company,<br><br>    Plaintiff,<br><br>vs.<br><br>EarthCo Enterprises, LLC,<br>an Arizona limited liability<br>company; Thomas Vella and<br>Jane Doe Vella, husband and<br>wife, Wesley Zlotoff and<br>Jane Doe Zlotoff, husband<br>and wife; Dominic Riccobono<br>and Jane Doe Riccobano,<br>husband and wife, and Jack<br>Thomas Riccobono and Jane<br>Roe Riccobono, husband and<br>wife, Scott Williams and<br>Jane Doe Williams, husband<br>and wife,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>) Case No. 2:23-cv-00109<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

_____

30(b)(6) Deposition Upon Oral Examination

of

EASTERN INDUSTRIES, LLC

ANTHONY SMITH

_____

Taken Via Zoom


DATE:  Tuesday, February 10, 2026
REPORTED BY:  Holly M. Christiansen, CCR 25024118



**Griffin Group International**
**888.529.9990 | 602.264.2230**

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Eastern Industries, LLC, a   )  
New York limited liability   )  
company,                     )  
                             )  
    Plaintiff,           )  
                             )  
vs.                          ) Case No. 2:23-cv-00109  
                             )  
EarthCo Enterprises, LLC,    )  
an Arizona limited liability)  
company; Thomas Vella and    )  
Jane Doe Vella, husband and )  
wife, Wesley Zlotoff and     )  
Jane Doe Zlotoff, husband    )  
and wife; Dominic Riccobono )  
and Jane Doe Riccobano,      )  
husband and wife, and Jack  )  
Thomas Riccobono and Jane    )  
Roe Riccobono, husband and  )  
wife, Scott Williams and     )  
Jane Doe Williams, husband  )  
and wife,                    )  
                             )  
    Defendants.          )  

_____

30(b)(6) Deposition Upon Oral Examination

of

EASTERN INDUSTRIES, LLC

JIM WELCH

_____

Taken Via Zoom

DATE:  Tuesday, February 10, 2026  
REPORTED BY:  Holly M. Christiansen, CCR 25024118



13

the information that Tommy was giving us on when he wanted us to grow up to 50 acres in 2020.

I think there's big damage to that.  We couldn't work with the farm anymore.  We got into fights together, like, as we were moving along.  I don't know how to attribute a dollar value to that.  All future business really, like, has been stopped because we didn't get paid from 2019 from EarthCo.

Q.   Okay.  And has there been any disclosure of dollar figures that Eastern Industries attributes to those buckets of damages?

A.   I don't know what you mean by "disclosure." Like --

Q.   In the course of the litigation, has anyone put down a number that they're claiming is attributable to those --

A.   I have never had anybody earmark an amount of damages attributable to a specific damage.  I know that we should be paid between 1500 and $2500 a kilo times 2354 kilos or whatever it is plus damages on top of that.

So I'm sure the Court will let us know what's attributable.

Q.   And has Eastern Industries retained an expert witness to give damages in this case?

A.   Not at this time.



14

product.

Q. Okay. When were you supposed to receive payment?

A. **January of 2020.**

Q. Is Eastern Industries LLC still an active entity with the State of New York?

Do you still file corporate records to maintain that entity?

A. **I can't answer that. Maybe Jim can.**

Q. When was Eastern Industries LLC formed?

A. **2019, I believe.**

Q. What was the business purpose of Eastern Industries at the time it was formed?

A. **The business purpose was to cultivate hemp.**

Q. Okay. Any other purposes?

A. **Just to cultivate and sell hemp.**

Q. Who are the original members of Eastern Industries?

A. **Eastern Industries was formed with Dreadfully Kind and Ancient Designs.**

Q. Was -- Dreadfully Kind and Ancient Designs, were they fifty-fifty members?

A. **More like -- I don't remember the exact structure because of the way it was broken up with the profit sharing, but we were -- majority is Ancient Designs, and Dreadfully Kind is 33 percent.**

22

was a hemp crop, and then you sold it to folks like you did in the case here with EarthCo.

Is that what you're telling me?

A.   Yes.

Q.   Okay.  And prior to selling the crop to EarthCo, had anyone involved with Eastern Industries ever sold a hemp crop to anyone else?

A.   **No, not to my knowledge.**

Q.   But you're telling me that the individuals involved with Eastern Industries had grown hemp before?

A.   **Yes.  I used to get consulting for farmers, and I would, you know, grow the product for them and they would sell it, you know.  Our background is farming, cultivation. So that's what we do.**

**And we partner with people on the sales side to move the product, to generate revenue.  We generate the product, and they generate revenue.**

Q.   Okay.

A.   **So we're on the farming side of it.**

Q.   Sure.  And what I'm trying to ask and get an understanding of is:  Had you ever farmed and cultivated hemp and sold it to anyone else before your relationship with EarthCo?

A.   **No.**

Q.   Had you ever farmed and cultivated other crops and



that we weren't allowed at that point.

And then, actually, here's another thing.  In one of the filings by them I read that they said that they could never return it to us.  And then after that, when we were in mediation, they offered to return half of it to us only.

So you can't really have it all those different ways.  Like, you're not going to give it to us.  You can give us half.  I don't know.  It's mind boggling, honestly.

Q.   Was there ever a time that Eastern Industries asked to personally access the processing facility to inspect and view the product and was told that, no, that cannot happen?

A.   I don't know.  I mean, Anthony was the one that traveled down there.  Like, I never traveled down there.  I have never been in that facility.  I only saw it through the FaceTime.

And there certainly could have been a time when we were fighting with them, where they said no.  But, like, I don't really -- I can't be sure about that.

Q.   Okay.  After the FaceTime call, was there ever a follow-up that was sent that put EarthCo on notice that you were unsatisfied with the inspection that had been conducted via FaceTime?

A.   There was never a letter sent that would be on



24

file.

Q.    Okay.  Does Eastern Industries have any evidence that EarthCo sold hemp powder to Muffin Town?

A.    So they did not sell any hemp powder to Muffin Town because Muffin Town would not buy it once their legal department said that it could not be used in food because they did not have the GRAS.

Muffin Town was a company that Alex and I had been working with since 2018 to produce some hemp protein bars. And this problem with Hemp113 after we had already made samples with it and then couldn't passed mustard with their legal department ruined our relationship with them, derailed the hemp protein bar project completely.

And if you're asking about damages, then, yes, I think we should earmark some damages for that as well.

Q.    And how much in damages are you attributing to that situation?

A.    I would have to calculate that out.  But, like, you know, that would have been potentially a very successful business that we couldn't continue with because Tommy lied to Muffin Town repeatedly.  There are entire emails strings of evidence to that.

Q.    Had Eastern Industries ever sold any products to Muffin Town in the past?

A.    Eastern Industries?



38

agreement that's on your screen.

A.    Okay.

Q.    Prior to signing the joint venture agreement, did Eastern Industries analyze the risk of doing business in the hemp industry?

A.    Sure.  Every business is risky.  Everything's at risk when they go in a business.

Q.    What were the risks that Eastern Industries identified of doing business in the hemp industry?

A.    Well, as a farmer we -- our biggest risk and concern is Mother Nature because we're not in control of that.  So that's our biggest risk with farming.  And if we have Mother Nature on our side, then we're doing well.  But that was a major risk in farming.

And also having sales channels.  Having someone like EarthCo that can distribute the product, you know, with a joint venture agreement.  As far as cultivating, we did cultivate the product.  We did cultivate an excellent product.  And we made the joint venture with EarthCo because of their proprietary process and their sales channels.

And it just seemed to never stick.  Everything was -- you know, they didn't have a GRAS certification. They told us they had GRAS.  They had a patent.  There was no patent.

43

And that's the introduction.  How we met EarthCo was through Dr. Bisci and John Finnegan on his Go Bean coffee bean.

Q.   When did that conversation happen with those gentlemen?

A.   It was during a harvest season, so I would say probably September, October of 2019.  That's whenever John introduced me to Tommy, which was EarthCo's representative.

Q.   So Eastern Industries had already planted and grown its 2019 hemp crop before it ever was introduced to EarthCo?

A.   Correct.

Q.   And you said that crop in 2019 was 20 acres, about?

A.   Correct.  Two 10-acre plots.

Q.   When did Eastern Industries first meet the folks at EarthCo?

A.   That was whenever after we signed the joint venture agreement and decided to work with EarthCo because of, you know, their sales channels and their proprietary process.  And then we signed the joint venture agreement. And they had actually sampled the product and was very happy with the product.

And we packaged it up.  We had put it in super sacks, dried it, bucked it all down.  And that was the main

49

November sometime.  That -- I mean, if you scroll to the bottom, you can see that -- look at it.  It was the 21st of November, I think.  Yeah, 12th.  So yeah.

Q.  So this document looks like it was signed on November 12 of 2019.

Do you remember when you began negotiating the terms of this document?

A.  The terms were in the document.  There is no negotiation.  What do you want to negotiate?

Q.  Who drafted this document?

A.  EarthCo.

Q.  Okay.  Were any revisions ever made by --

A.  No.

Q.  -- Eastern?

A.  No.  It's twice I told you, we never redlined it or revised it at all.

Q.  So EarthCo drafted up this document, sent it over to you, and you guys agreed to it as it was written?

A.  Correct.

Q.  Did you have a lawyer help you out with reviewing this document before it was signed?

A.  Yes, we did.

Q.  Was that Joshua Bauchner?

A.  Yes, it was.

Q.  B-a-u-c-h-n-e-r?

51

answering your question, and I'll let you finish your answer before I start my next question; is that fair?

A.    Sure.

Q.    So what I was trying to ask you was:  What specific representations were made by EarthCo to Eastern prior to the signing of this joint venture agreement on November 12th, 2019?

A.    **So the reason why we decided to sign the joint venture agreement because the promises that were made were that they had that proprietary Hemp113 product that was in demand that could be sold internationally through a group called Taiyo, that EarthCo was doing business with prior, and they're going to distribute the hemp.**

**And it's going to go on their website as a food ingredient.  Everybody can use it.  It's GRAS certified.**

**So it kind of like -- was very, like, intriguing and interesting, I guess, the sales pitch, if you want to call it that, to get the product.**

Q.    Sorry.  I didn't mean to cut you off.

The sales pitch you said was intriguing or interesting?

A.    **Yes, it was very, very interesting and better than other deals out there.  That's why we went with EarthCo.**

Q.    Who made those representations to Eastern?

A.    **Thomas Vella.  And once we got down the road a**



55

myself.  And -- you know, and we came to an agreement to sign the joint venture.

ATTORNEY WOODS:  Hey, Peter, are we getting close to a good stopping time?

ATTORNEY FOSTER:  Yeah.  Let me just finish this line of questioning, then we can take a break.

ATTORNEY WOODS:  No worries.

BY ATTORNEY FOSTER:

Q.   Did -- what I'm trying to figure out, Mr. Smith, is when you shared the information you had learned from Tom Vella with your colleagues, did you do that in person?  Over the phone?  Via text message?  Via email?

A.   If some of us were on the farm, it was talking face-to-face, and if they weren't on the farm, it was on the phone.  I don't think we corresponded that in email, but I'm sure there was emails with Tommy and myself about it if you want to dig into it.

Q.   Okay.  And just to be clear, the representations that Tom Vella made to you prior to signing this joint venture agreement were that this product was going to be distributed through national and international channels, right?

A.   Yes.

Q.   Oaky.  And he represented to you that he was going to have product sold in Circle K stores?

56

A.    Correct.

Q.    Okay.  What other --

A.    He had sales channels through Circle K.  And basically just that the product itself, the Hemp113, was, you know, the reason why EarthCo had this proprietary process.  That's basically -- you know, it was different.  It was effective.  It was an ingredient.  It was, you know, sales channels.  It was everything you wanted to hear.

Q.    Okay.  Do you remember any other specific representations that Mr. Vella made to you prior to the signing of the joint venture agreement?

A.    No.

Q.    So it was he told you about his intent to distribute this product in national and international channels; he told you about his intent to sell the product in Circle K stores; and he told you about a proprietary process for processing the hemp?

A.    Yes, that was the reason why we signed the agreement.

Q.    Okay.  Aside from those things that I just summarized, did he make any other representations to you?

A.    Like I said, we just talked daily on the packaging and stuff like that, for the hemp to get it to his facility the correct way, and the moisture contact and stuff like that so it could be all on spec.

72

A.   Yeah, we saved everything that we can save.  I mean, I don't get a receipt for a worker working, paying them cash.  But...

Q.   Were the receipts kept in a box someplace, or were they scanned into the computer somehow?  How was it done?

A.   I know the receipts I had I just kept in the folder.

Q.   Do you still have that folder?

A.   I have to look.  I should have it.  It's been a very long time.

Q.   There's another spreadsheet that starts on page 127 of Exhibit 3 to your deposition.

This is -- is this the same kind of thing, expenses that went into the crop for 2019?

A.   Yes, it is.

Q.   Okay.  And it's your testimony that all of these expenses add up to $390,973.09?

A.   I mean, those expenses.  But the credit card, the interest and stuff, it probably super exceeds that by now.

Q.   Okay.  These were expenses that Eastern Industries was going to incur no matter what, correct?

A.   Yes.

Q.   These expenses were going to be incurred by Eastern whether Eastern made money or lost money on the joint venture, right?

73

A.    Correct.

Q.    A lot of these expenses were incurred, it looks like, before Eastern Industries ever even knew about EarthCo or was introduced to EarthCo, correct?

A.    Correct.

Q.    Let's talk a little bit about Eastern's claims in the case, Mr. Smith.

Eastern asserts that EarthCo breached the joint venture agreement by failing to use its resources to sell products in a timely manner, right?

A.    Okay.

Q.    Is that true?

A.    Yes.

Q.    Eastern claims that EarthCo breached the joint venture agreement by failing to provide quarterly financial accounting reports, correct?

A.    Yes.

Q.    Eastern asserts that EarthCo breached the joint venture agreement by failing to market and advertise the products, correct?

A.    Correct.

Q.    EarthCo asserts that EarthCo breached the joint venture agreement by failing to share revenue, correct?

A.    Correct.

Q.    Eastern asserts that EarthCo breached the joint

128

from the sale of products made with your hemp.

A.    Yes.   It was a fifty-fifty split.

Q.    And just to be clear, you're not claiming that Eastern is entitled to revenues generated from products made with other farmers' hemp, right?

A.    If they're our clients, and we're bringing all the clients to EarthCo to manufacture products, why would they use someone else's hemp?

Q.    That doesn't answer my question.

Are you making a claim in this case that Eastern is entitled to revenues generated from the sale of other farmers' hemp?

A.    No, we're not entitled to any other farmers' but our own.

Q.    And you knew that EarthCo was sourcing hemp from other farmers?

A.    One other farmer I knew of in 2019.

Q.    Was that the farmer in Oregon?

A.    Yes.

Q.    At some point, EarthCo provided an advance payment of $10,000 to Eastern, correct?

A.    Correct.

Q.    Why was that advance payment made?

A.    Because they were financially putting a burden on us, and it was a loan to pay back the lawyer.  So we

161

right?

Q.    Sure.  And just because your hemp was in a condition that it was -- it passed the testing that the state of New York required doesn't necessarily mean that it was in a condition that would pass any other kind of use for it in a powder format, right?

A.    **Wrong.**

Q.    So your position is because your hemp biomass passed the New York specifications that were done at the time of it was harvested, it was therefore available to be used in any -- for any purpose, including food purposes or medicinal purposes or anything else?

A.    **No.**

Q.    Okay.  What was your position, then, on --

A.    **Our position was to cultivate hemp.  When we sent our hemp to EarthCo, and they did their testing on it and got back to us and said, "You have an excellent product. It supersedes -- I might even have to dilute it because your CBD content is so high.  We'll take your product."**

Q.    Okay.  And then they were obligated -- EarthCo was obligated to go and try to sell it to end users, correct?

A.    **They took our product, and then whatever they did with it with their proprietary process after and sales channels, I don't know what happened.  Like I said, you have to -- maybe that's some questions Sean has to get to**

176

obligations under the joint venture agreement, correct?

A.   Could have.

Q.   Okay.  The decision to produce -- to provide 7500 pounds was Eastern Industries' decision, correct?

A.   **EarthCo and in Eastern Industries agreed on it because the product, like I said, tested well, so they wanted all the product.**

Q.   Right.  But you could have said, "Hey" -- Eastern Industries could have said --

A.   **It was a joint venture decision.**

Q.   Right.  But Eastern Industries could have said, "You know what, we don't want to take the risk of giving our entire harvest to you, EarthCo, so we're only going to produce 2500 pounds, which is the minimum we have to produce pursuant to our contract."

You could have done that, right?

A.   **Could have.**

Q.   But you didn't do that.

A.   **No, we had a sweet deal with them.**

Q.   Okay.  And the risk of the joint venture agreement was that if you produced all of your crop to EarthCo, it may not pan out and you may not make the money that you're expecting to make.  That was Eastern's risk, right?

A.   **Say that question again.**

Q.   Both parties to this joint venture agreement had



177

risk.  Do you agree with me?

A.    Yes.

Q.    Okay.  Eastern's risk was that it was providing a hemp crop that it could have done something else with.  But instead of doing something else with it, it decided to contribute the entire crop to the joint venture agreement.

A.    Right.

Q.    That was Eastern's risk, right?

A.    Correct.

Q.    Okay.  And EarthCo's risk was that they were obligating themselves to be financially responsible to turn the hemp into hemp powder, and then market, distribute, and sell the powder into goods that would generate revenue, correct?

A.    Correct.

Q.    Eastern Industries didn't have any contractual obligations to spend any money beyond what it spent to produce the hemp, correct?

A.    Correct.

Q.    Do you have any evidence, as you sit here today, that Eastern Industries' hemp was used in the powder that was sold to the Chronic Krispie product?

A.    Do I think that Eastern Industries' hemp was sold to Chronic Krispie?

Q.    Do you have any evidence that it was?

180

C E R T I F I C A T E

BE IT KNOWN that the foregoing proceedings were taken before me; that the witness before testifying was duly sworn by me to testify to the whole truth; that the foregoing pages are a full true, and accurate record of the proceedings, all done to the best of my skill and ability; that the proceedings were taken down by me in shorthand and thereafter reduced to print under my direction.

I CERTIFY that I am in no way related to any of the parties hereto, nor am I in any way interested in the outcome hereof.

[X]  Review and signature was requested; any changes made by the witness will be attached to the original transcript.
[ ]  Review and signature was waived/not requested.
[ ]  Review and signature not required.

Dated this 10th day of February, 2026.

/s/Holly_Christiansen_____
HOLLY CHRISTIANSEN, CCR
Certified Reporter
Washington CCR No. 25024118
Georgia CCR No. 6755-3684-0320-9464



**Griffin Group International**
**888.529.9990 | 602.264.2230**