UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Eastern Industries, LLC, a New York )
limited liability company, )
)
            Plaintiff, )
)
      vs. )   Case No.:
)   2:23-cv-00109
EarthCo Enterprises, LLC, an Arizona )
limited liability company; Thomas )
Vella and Jane Doe Vella, husband )
and wife; Wesley Zlotoff and Jane )
Doe Zlotoff, husband and wife; )
Dominic Riccobono and Jane Doe )
Riccobono, husband and wife; and )
Jack Thomas Riccobono and Jane Roe )
Riccobono, husband and wife; Scott )
Williams and Jane Doe Williams, )
husband and wife, )
)
            Defendants. )
_____)

VIDEOCONFERENCE DEPOSITION OF
WESLEY MARTIN ZLOTOFF

Scottsdale, Arizona

March 26, 2026

Prepared by:

Kathryn C. Cannon, CER
Certified Electronic Reporter
CER No. 4929

**CERTIFIED TRANSCRIPT**

packaged in super sacks and shipped within 21 days after harvest and successful testing to a processing facility within the Continental USA as designated by EE."  Did I read that right?

A.    Yeah.

Q.    Moving on to subsection B, it says, "EE shall contribute to the Joint Venture according to the following terms."  Did I read that right?

A.    Yeah.

Q.    Okay.  So the following terms were EE's obligations under the joint venture agreement, correct?

A.    Yeah.

Q.    Subsection Roman numeral small i says, "EE shall use its patented technology and other resources to produce sellable CBD Products from the industrial hemp provided by JVCompany."  Did I read that right?

A.    Yeah.

Q.    What did it mean -- what does that clause mean by "patented technology"?

MR. FOSTER:  Form.  Foundation.

THE WITNESS:  Like, Tom had -- he had the rights to produce products using like a low heat process that would process the powder without, like, disrupting the actual plant nature.

Eastern Industries, LLC vs. EarthCo Enterprises, LLC
Wesley Martin Zlotoff

March 26, 2026
48

BY MR. WOODS:

Q.   Was it your understanding that Tom would contribute, as part of his ownership, his patented technology?

A.   Yeah.  I mean, in the sense of we would be processing, you know, our industrial hemp using that technology, yeah.

Q.   Did Thomas Vella personally own that patent?

A.   Yeah.

Q.   Was there a -- ever a licensing agreement set up between EarthCo and Thomas Vella regarding that patent?

A.   No.

Q.   Was there ever an agreement in place for EarthCo to provide any kind of payment to Mr. Vella for use of the patent?

A.   Not specifically for use of the patent.  I mean, it might have been part of a larger understanding of what became of the business, but it wasn't specifically for the patent.

Q.   Okay.  Furthermore, under -- we'll continue under this section.  It says, "EE shall be solely responsible, financially and alike, to provide all manufacturing and distribution resources, including but not limited to processing, packaging, marketing and fulfillment of finished goods."  Did I read that right?

A.    Yeah.

Q.    Okay.  Under subsection Roman numeral ii, it says, "EE shall use its marketing resources to the fullest extent to sell Products in a timely manner."  Do I have that right?

A.    Yeah.

Q.    So under the joint venture agreement, EarthCo's contribution or obligation was to use its marketing resources to the fullest extent, correct?

A.    Yeah.

Q.    What did -- what does it mean by "marketing resources"?

MR. FOSTER:  Form objection.  Foundation.

THE WITNESS:  To get out there and try to find clients and -- whether it be trade shows or meetings, facility, or whatever it took to try to find clients that wanted to buy the product, the finished product, the powder.

BY MR. WOODS:

Q.    You mentioned trade shows.  What trade shows?

A.    We went to one early on in Vegas.  There's quite a few trade shows throughout the year for our industry -- you know, for that industry.

Q.    The cannabis/CBD type industry?

A.    That was a part of it, but not -- you know, there

Eastern Industries, LLC vs. EarthCo Enterprises, LLC
Wesley Martin Zlotoff

March 26, 2026
50

are some, I'm sure, that are specifically towards that. But there's large vendor trade shows where ingredient buyers will show up to meet with ingredient suppliers.

Q.   Okay.  So outside of the trade shows, what else did EarthCo do for marketing resources?

A.   Try to schedule a lot of meetings with companies that were in the manufacturing space, have people at the facility send out samples, send out our marketing, you know, material.  Basically just outreach to anyone that was in the space for manufacturing using industrial hemp powder.  Mainly, like -- even like a CBD company, we would go after them and see if we could get them to understand our product and want to use it in their industry products they were making.

Q.   And the samples you would send out would be -- would be that powder?

A.   Yeah, you know, like a really small amount of powder we would send them, and then send them like a COA, which is certificate of analysis, and then just some marketing material of what the cannabinoids in the hemp plant could do for a person.

Q.   Okay.  Under subsection iii it says, "EE shall be responsible for storing all inventory of Products produced from the Joint Venture."  Do I have that right?

A.   Yeah.

Case 2:23-cv-00109-SMB   Document 133-1   Filed 06/09/26   Page 6 of 19

Eastern Industries, LLC vs. EarthCo Enterprises, LLC                March 26, 2026
Wesley Martin Zlotoff                                                            56

THE WITNESS:  [Indiscernible] received a report, you know, that showed that there -- just no sales were happening.

BY MR. WOODS:

Q.   Under Section 4, Pricing of Products, the joint venture agreement says that "Pricing of Products made from this Joint Venture shall be based on the following terms," correct?

A.   Yeah.

Q.   That "EE shall market and advertise Products from this Joint Venture at a price no less than $2,500 USD per kilogram," correct?

A.   Yeah.

Q.   What marketing and advertising did EarthCo do to advertise these products?

A.   It was part of our packet that we would send out, like with samples.  Or if we had met someone, you know, like, at the trade show or -- companies that we thought would be a good fit for what we were trying to do, there was a packet that we would send to them, like a marketing packet, that would have the pricing.  And, I believe it was like tiered.  You know, like, it showed -- like, you know, if you buy this many kilos, you know, we can do this.  But it was -- it was -- the $2,500 price point would have been listed in there.

Q.   Do you know how many companies or people that you met that you sent these materials and samples to?

A.   We sent out quite a bit.  I don't know the exact number.  But we would send out a lot.  And when we would go to the trade shows, we'd pass it out to a ton of people, people that walk by.  I don't know the exact number, though.

Q.   Subsection ii here says, "EE shall have the right to negotiate final sales pricing of Products to a minimum of $1,500 USD per kilogram."  That's correct, right?

A.   Yeah.

Q.   "This right is granted in the event of a large bulk order or acquisition of a new customer through the sale of an initial test kilogram," correct?

A.   Yeah.

Q.   Did you make any sales of initial test kilograms?

MR. FOSTER:  Form.  Foundation.

THE WITNESS:  We did, like, single sales, you know, like a few of them.  Like, four or five.  I mean, the invoices that I sent you guys.  But those weren't -- those weren't viewed as initial test kilos because it was just -- the company just didn't -- that was trying it out didn't really -- I guess maybe you'd call it test, but they weren't really buying it with that mindset.  I mean, if we had gone and we're able to actually close,

you know, all the sales that -- you know, the -- the lack of. But yeah, they were -- they were sent, like, a report.

Q. Okay. Did that happen every quarter that the joint venture was in place?

A. I -- I don't -- I don't believe so, to be honest with you. I don't think -- I don't think it was every quarter. I think because the sales were just not happening. But I don't know how often, you know.

Q. Do you know if those -- whatever reports were sent were done under GAAP standards?

A. Yeah, they should have been. I mean, if they were done by our accounting team, it would have been, I'm assuming, under those standards.

Q. Did EarthCo ever distribute any sales revenues to Eastern Industries?

MR. FOSTER: Form. Foundation.

Go ahead.

THE WITNESS: We -- there were no sales, so we didn't send them, like, sales revenue. But we did send them like an advanced payment, which -- you know, they -- I think what they did is they contributed it to -- what we did is we contributed it to, like, sales of the product as if like we had sold it, just to, you know, give them, like, some money in their pockets. So, I mean, that was

the only money that I think we ever transferred to them was the advanced payment in good faith.

BY MR. WOODS:

Q.   And that was the $10,000 payment?

A.   Yeah.

Q.   And that -- that came from Dom, correct?

MR. FOSTER:  Form.  Foundation.

THE WITNESS:   I don't recall if it -- I believe it came out of EarthCo, but I'm not -- and Dom may have been the one that went and deposited money into EarthCo's account, you know, to have -- or transferred it there so it could be sent out to them, but -- you know.

BY MR. WOODS:

Q.   Do you believe that EarthCo complied with all of its obligations under the JV agreement?

A.   Yeah, we tried to.  I believe, you know, we were doing everything we could to try to sell the product.  I mean, to get clients, someone that would commit to a large order and we could, you know, kind of start moving the wheel.

Q.   Did Thomas Vella ever tell you that the process to create the HEMP113 was actually patented?

A.   I believe -- I believe that was the understanding, yeah.

Q.   My question was slightly different.

one with Eastern Industries, correct?

A.    Yes.

Q.    And when that hemp flower would be sent to EarthCo, did EarthCo segregate the hemp powder based on who sent it?

A.    Yes.

Q.    When it was processed into the HEMP113 powder, did EarthCo continue to segregate based on the original supplier of the flower?

A.    Yes.

Q.    When powder was sent to a company, like Vitalbody, did EarthCo track whose powder that came from?

A.    Yes.

Q.    Do you recall whose powder was sent to Vitalbody for this invoice?

A.    Yes.  That would have been our initial kilos that we produced from the biomass that we bought from Apex Bioscience.

Q.    There's another entry here on May 26 for $40,000 from Best Value Promotions, LLC.  Do I have that right?

A.    Yes.

Q.    What was Best Value Promotions?

A.    I can't recall.  It might have been -- might have been like that going out.  It would have been probably, like, a reimbursement at that date for partners who were

Q.    And this was August 12, 2021?

A.    Yeah.

Q.    Did Taiyo buy that coffee powder?

A.    I believe so.  Yeah, I mean, they -- I think the other -- the bank transaction -- or the bank statement you showed had the 50 percent deposit for this -- for this purchase order.

Q.    Did EarthCo ever provide Taiyo with HEMP113?

A.    Yeah.

Q.    Was that tied in to the coffee?

A.    No.  No, they're different, completely different.

Q.    So did EarthCo ever actually provide HEMP113 to Taiyo?

A.    We did, yeah.

Q.    How much did you provide to Taiyo -- or did EarthCo provide Taiyo?  Do you recall?

A.    I don't recall the exact number, but I believe you should have the -- you know, the purchase order and what was -- you know, whatever number is on there, is what we sent over to them, they bought from us.

Q.    The HEMP113 that was provided to Taiyo, do you know whose powder that was?

A.    Yeah, I know.

Q.    Whose was it?

A.    We -- we sourced industrial hemp from a farm.  I

believe it was in -- the farm was in Oregon.  It met all of the requirements that Taiyo was asking of us, as far as testing appropriately on the raw ingredient, like, level. And also once we finished processing that, it passed all the specifications that they required.  So that -- we bought that from a farmer up there in order to be able to produce industrial -- produce our powder that was purchasable by Taiyo, according to, like, their guidelines of, you know, what they had to -- the specifications they had to follow as being like a large ingredient supplier.

Q.    At Apex -- was the -- do you remember the farmer's name?

A.    I don't remember his name.  Tommy dealt with him more than I did.

Q.    Does Craig sound familiar?

MR. FOSTER:  Form.  Foundation.

THE WITNESS:  It doesn't.  To be honest with you, I don't -- you know, I don't really -- I don't remember the guy's name.

(Deposition Exhibit 16 was marked for identification.)

BY MR. WOODS:

Q.    Okay.  I have an email SMS chain here.  Have you ever seen this before?

A.    Am I on it?  I mean --

Eastern Industries, LLC vs. EarthCo Enterprises, LLC
Wesley Martin Zlotoff

March 26, 2026
107

Q.   Okay.  Then you text and said, "Morning, guys.  I was on a call with the EarthCo partners, and they reminded me that we already have your bank account info from when we sent Anthony the 10,000 advanced payment.  I will send a wire out to that bank.  Thanks."  Do you recall that?

A.   Yeah, I do.

Q.   Okay.  And then Anthony said I don't have that account -- or "Don't have that account," correct?

A.   Yeah.

Q.   What payment was this that you were talking about?

A.   After we completed the purchase order for Taiyo and they paid us, it was a joint venture payment that we were going to -- we wanted to send to Eastern Industries.  So it was part of, like, you know, an agreement that we -- we wanted to have with them to where we could get good enough industrial hemp to satisfy what Taiyo was looking for and still in good faith just, like, "Hey, it's not your hemp, but, like, we want to give you guys money.  We want to -- we want to make this right with you guys."

Q.   And what was that payment amount?

A.   I don't recall the exact number, what the payment was.

Q.   What do you mean by "make this right"?

A.   I think we all wanted to make money in this

business.  They were really frustrated.  We were frustrated.  We just -- at least internally, I know from me and the phone calls I had with them and with their constituents and the people -- you know, their colleagues. I would always tell them that I can't wait until we can send you guys a check.  Because, I mean, I wanted to -- I wanted this to be successful.  So that's kind of -- my heart was just like, let's try to make some money.  So when we finally did get paid, you know, for selling a large portion of what we were trying to accomplish, I was really excited to send them a payment.

Q.   That was -- sorry.  That HEMP113 -- that was for HEMP113 powder?

A.   Yeah.

Q.   From Eastern?

A.   No.  No, we didn't sell their powder.  That wasn't their powder.  We produced new powder that was acceptable by Taiyo under their specifications that they had to have.

Q.   Scrolling back in this.  It's a long chain.  I'll try to get there.

Okay.  On October 14, 2021, you wrote, "Alan, the addendum to the contract was sent to the partners, and is now with our attorney for final review," correct?

THE WITNESS:  No.

BY MR. WOODS:

Q.   So this was a unilateral decision by EarthCo?

MR. FOSTER:  Form.  Foundation.

THE WITNESS:  I don't think it was a unilateral decision.  I think -- I mean, just looking at this, right, with their 25 percent discount, Taiyo gets, as our distributor.  I mean, I think that there was, in the contract -- I don't know.  I'm speculating.  But there was, you know, minus cost of distributors, maybe that's what -- where he came up with that.  I don't know.

BY MR. WOODS:

Q.   Do you ever recall seeing anything in writing from EarthCo saying that they agreed to the reduced price with Taiyo?

MR. FOSTER:  Form.  Foundation.

THE WITNESS:  No.  But this wasn't their hemp.  This wasn't their powder.  So, you know -- yeah, we were trying to provide money to them based on powder that we went out and purchased -- biomass that we purchased processed and delivered within the specifications that Taiyo required.

BY MR. WOODS:

Q.   Okay.  Tommy's text message says that 75 kilograms will come from your group and 75 kilograms

A.    No.

Q.    No -- no other hemp vendors?

A.    No.

Q.    Anything related to coffee, any joint ventures related to that?

A.    I mean, EarthCo wasn't doing the coffee at that time, so -- but there's nothing that I'm aware of that -- that was going on with the coffee as far as joint ventures or anything like that.

Q.    Going back to Exhibit 22, which was that Addendum A.  I'm on the 23rd page of it.  And it's written that "EarthCo made multiple wires in reference to DEFENDANTS000994, 995, 1519 to 1560, to the following parties with the follow purposes."  I have that right?

A.    Yeah.

Q.    Okay.  There's an entry in here that says, "Whole Foods . . . Spectrum Processing, LLC (guaranteed payments which commenced at the start of EarthCo per [the] partnership agreement)."  Is that correct?

A.    Yeah.

Q.    What was the partnership agreement?

A.    Without looking at it, I can give you, like, probably a general summary of what it was.  It was essentially that Tommy would maintain 50 percent ownership of the new entity, which would have -- you know, is

EarthCo.  And that the other partners that were involved, we would each take 10 percent ownership in exchange for, you know, funding initially, like we did, like, you know, for the amount that I put in.  And in exchange for, you know, using, you know, the facility he was in and, you know, the technologies that he, you know, had, and basically -- oh, and it included guaranteed payments, like to Tommy.

Because, I mean, originally it was -- he wanted, I think, a lot of money, and we were just like, you know, the number made sense as long as we spread it out over the course of the business.  So we just -- we ended up coming to terms on guaranteed payments to him. So we would put in -- put in money, like the partners.  I mean, I think my capital raised -- the capital account in the company was -- I put in like a total like $110,000 over the course of the business when I was there.  And the partners put in well over a million.  I mean, something that -- probably $500,000 range each.  A lot of that was to fund these guaranteed payments and to keep the business going and just try to turn into something.

Q.   There's an entry here for Owyhee Produce.  It says "Purchase of industrial hemp to satisfy Taiyo's order."  What does that mean?

A.   That's the company we spoke about.  That's -- we

We -- I just, I mean, left the company.  You know, disbanded partners.

MR. WOODS:  Go ahead and mark this as Exhibit 26.

(Deposition Exhibit 26 was marked for identification.)

BY MR. WOODS:

Q.   On your screen there it says "Articles of Amendment to Articles of Organization."  You see that?

A.   Yeah.

Q.   At the top it says "Arizona Corporation Commission," received on March 7, 2023.  Is that right?

A.   That's correct.

Q.   Entity name is EarthCo Enterprises, LLC.  Is that correct?

A.   Yeah.

Q.   Scrolling down, principal says Member: Tom Vella, correct?

A.   Yeah.

Q.   And then signature says Member: Wesley Zlotoff. Do I have that right?

A.   Yeah.

Q.   That was on March 7, 2023?

A.   Yeah.

Q.   Why did everybody withdraw from EarthCo, to your

knowledge?

A.   I mean, we met in September of 2022, and partners were -- they just were -- they were done funding.  It just was costing them a lot of money, and there just wasn't any funds to -- you know, to keep it going.  It just was -- it was too costly.  And for me, I was just like, I'm not making any money.  I mean, I've got a business that's -- you know, like I spoke about earlier, that I was in the technology business.  I mean, that business luckily was kind of self-maintained.  And when that started going south for me as well, I just -- I mean, I had to find -- I needed a path to provide for my family, and this EarthCo just wasn't doing it for me.  But it mainly was a decision amongst the partners that were funding everything that it just wasn't feasible.  It was failing.

Q.   When you withdrew, did EarthCo have any assets?

MR. FOSTER:  Form.  Foundation.

THE WITNESS:  Assets in the sense of like money in the bank?

BY MR. WOODS:

Q.   Equipment?  Money?

A.   Yeah, I'm sure.  Yeah, I'm sure there were -- you know, there was equipment and stuff that -- you know, if you're talking about like at that moment, yeah.  Because EarthCo, Tommy was a part of that, and there was equipment